This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 38
Millennium Holdings LLC,
             Plaintiff,
The Northern Assurance Company of
America,
             Appellant,
Certain Underwriters at Lloyd's,
et al.,
    Intervenors-Appellants,
        v.
The Glidden Company, &c., et al.,
             Respondents.

            Carl S. Kravitz, for appellant.
            Maura Monaghan, for respondents.
            United Policyholders; Complex Insurance Claims
Litigation Association, amici curiae.

ABDUS-SALAAM, J.:

            In this action, appellants insurance companies seek to

be subrogated to the right of their insured, plaintiff Millennium

Holdings LLC (Millennium), to indemnification against

respondents, the Glidden Company, now known as Akzo Nobel Paints

LLC, following the insurance companies' satisfaction of

Millennium's obligations pursuant to monetary settlements reached

in certain lead paint related cases.  The courts below, applying

- 1 -

the antisubrogation rule, held that the insurance companies could not subrogate. We disagree, and hold that the antisubrogation rule does not apply in this case.

I.

The complex corporate history of the parties is central to resolving this indemnification dispute. The Glidden company, incorporated in Ohio in 1917, made, marketed and sold lead paint, including, until 1958, lead pigment. Glidden was bought by SCM Corporation (SCM) in 1967. SCM placed Glidden's operations in a division entitled the Glidden-Durkee Division. Between 1962 and 1970, primary and excess insurance policies were issued to Glidden, and thereafter the Glidden-Durkee Division of SCM, by the appellant insurance companies, including certain underwriters at Lloyd's, London and certain London Market Insurance Companies (the London Insurers), as well as the predecessor of Northern Assurance Company of America (collectively, where appropriate, the Insurers). A number of the policies issued between 1963 and 1968 provide the Insurers with a right to subrogation, whereby, after paying a claim on behalf of its insured, an insurer may seek to enforce the insured's rights against another entity to recover its loss (see Federal Ins. Co. v Arthur Andersen & Co., 75 NY2d 366, 372 [1990]).

In 1986, Hanson Trust PLC purchased SCM in a hostile

takeover.[1]  SCM adopted a Plan of Liquidation and Dissolution,
where it distributed its remaining assets and liabilities between
20 "fan companies," entitled HSCM 1 through 20.  SCM placed the
assets and liabilities of the Glidden paints business into
HSCM-6.  SCM memorialized this distribution in a Memorandum of
Distribution and Liquidation which expressly noted that the
insurance policies issued to Glidden and SCM were excluded from
the distribution to HSCM-6.  Thus, the insurance policies that
were issued to SCM and Glidden were not included in the assets of
the Glidden paints business which were distributed to HSCM-6.
Following the distribution of assets to HSCM-6, the stock of
HSCM-6 and all remaining undistributed assets of SCM were placed
in HSCM-20, including the insurance policies issued by the
Insurers.[2]

As relevant to this appeal, the critical moment in the
corporate history of the parties occurred in 1986, when HSCM-20
entered into a purchase agreement under which it sold all the
stock in HSCM-6 to ICI American Holdings (1986 Purchase
Agreement).  Although ICI American Holdings held all the HSCM-6
stock, HSCM-20 retained the insurance policies.  The 1986
Purchase Agreement also included certain indemnity obligations,

---

[1]  Prior to Hanson's acquisition of SCM, SCM placed its
pigments business into a subsidiary, ABC Chemicals Inc.  SCM
retained its paints business.

[2]  This distribution to HSCM-20 also included ABC Chemicals
Inc.

due to successor liability concerns.  Under section 9.1 (c) of

the 1986 Purchase Agreement, HSCM-20 agreed to indemnify ICI

American Holdings for an eight-year period between 1986 and 1994

for claims arising from:

> "product safety or liability, health or
> welfare conditions or matters arising from or
> relating to acts, omissions, events or
> conditions of or relating to the Business,
> the Predecessor Business or the Former
> Business occurring or existing prior to the
> Closing or otherwise arising out of or
> relating to the conduct of the Business, the
> Predecessor Business or the Former Business
> prior to the Closing."[3]

Under section 9.3 of the 1986 Purchase Agreement, ICI

American Holdings agreed to indemnify HSCM-20 after 1994,

> "from, against, and in respect of any Claims
> relating to the Business arising from or
> relating to the acts, omissions, events or
> conditions of or relating to the Business,
> the Predecessor Business or the Former
> Business occurring or existing prior to, on
> or after the Closing or otherwise arising out
> of or relating to the conduct of the
> Business, the Predecessor Business or the
> Former Business prior to, on or after the
> Closing arising against Indemnitees for
> matters referred to in Section 9.1 (b), 9.1
> (c) or 9.1 (e) to the extent that [ICI
> American Holdings] would not be entitled to

---

[3]  HSCM-20 and ICI American Holdings agreed that the amount
of the indemnity for this initial eight-year period would
decrease gradually, until it expired in 1994.

indemnity under Sections 9.1[4] and 9.2.[5]"

Through a series of corporate transactions, HSCM-20 became plaintiff Millennium, and ICI American Holdings assigned HSCM-6 to an entity that became Akzo Nobel Paints (ANP). Accordingly, based on the 1986 Purchase Agreement, Millennium and its predecessors were required to indemnify ANP and its predecessors from 1986 to 1994. In turn, ANP and its predecessors were required to indemnify Millennium and its predecessors from 1994 onward.[6]

Commencing in 1987, a number of lawsuits were filed across the nation against the predecessors of Millennium and ANP, alleging either personal injury or property damage from the lead paint they produced, or that the lead paint was a public nuisance requiring abatement (hereinafter the Lead Cases). Between 1987

---

[4] Section 9.1 concerns the indemnification obligations of HSCM-20, as the seller, and defines Business, Predecessor Business, and Former Business. Those definitions are not relevant for purposes of this appeal.

[5] Section 9.2 outlines the periods applicable to and the limitations upon HSCM-20's indemnification obligations.

[6] At the same time the 1986 Purchase Agreement was entered into, Hanson -- the purchaser of SCM -- attempted to enter into a Side Letter Agreement, under which it purported to provide ICI American Holdings with the benefit of the insurance policies that had applied to SCM and Glidden. Notably, this transfer was later invalidated by the Ohio Supreme Court in an indemnity action between Glidden and certain comprehensive general liability insurers. That Court held that Hanson was not a named insured in the relevant policies and consequently could not transfer the policies to ICI American Holdings (see Glidden Co. v Lumbermens Mut. Cas. Co., 112 Ohio St 3d 470, 477 [Ohio 2006]).

and 1994, pursuant to the 1986 Purchase Agreement's indemnification provision, ANP's predecessors were indemnified by Millennium's predecessors for their defense costs in the Lead Cases. However, when the indemnity obligation flipped in 1994, ANP's predecessor refused to indemnify Millennium's predecessor, claiming it was not obligated to do so under the 1986 Purchase Agreement. As a result, in 1994, ANP's predecessor and Millennium's predecessor commenced actions against each other in both New York and Ohio state courts to resolve the dispute.[7] That litigation settled in 2000, and the settlement agreement incorporated a Novation Agreement, whereby ANP acquired ICI American Holdings's indemnity obligation under section 9.3 of the 1986 Purchase Agreement. The parties amended the 1986 Purchase Agreement consistent with the settlement (the Amended Purchase Agreement). The settlement, however, expressly left open the parties' indemnification obligations regarding the Lead Cases.

During pendency of the 1994 litigation, the London Insurers agreed to pay the defense costs of both Millennium and

---

[7] ANP's predecessor essentially argued that it was not obligated to indemnify Millennium's predecessor for "pigment" claims versus "paint" claims; in ANP's predecessor's view, since the remnants of any of Glidden's pigments business had been transferred to ABC Chemicals prior to ICI American Holdings's purchase of HSCM-6, the indemnification provisions did not cover pigment claims. Apparently, plaintiffs in the Lead Cases made distinctions between lead-based paint and lead-pigment manufacturers, generally pursuing lead-pigment manufacturers rather than lead-based paint manufacturers due to difficulty in determining the actual manufacturers for the paint at issue.

ANP under an Interim Defense Agreement.  However, the London Insurers terminated that funding agreement in 2000, and sought a declaration in Ohio state court that they were not required to provide ANP with a defense and indemnification in the Lead Cases, based on the subject policies.  In 2006, the Ohio Supreme Court held that ANP was not covered under the relevant policies "by operation of law or by contract," as it was not a named insured on any of the relevant policies and, additionally, its subsequent purchase of HSCM-6 included an assumption of liabilities (Glidden Co. v Lumbermens Mut. Cas. Co., 112 Ohio St 3d 470, 470, 474-475 [Ohio 2006]).[8]

Thereafter, in 2008, Millennium commenced this action seeking indemnification from ANP for fees and claims associated with the Lead Cases.[9]  After procedural history not directly relevant here, ANP asserted certain counterclaims.[10]  The London Insurers filed a motion to intervene in the action.  While that motion was pending, Millennium's settlement of a California lead

---

[8]  As mentioned, this decision also invalidated Hanson's Side Letter Agreement attempting to provide ICI American Holdings with the benefits of SCM's insurance policies.

[9]  Subsequently, in January 2009, Millennium filed for chapter 11 bankruptcy.

[10]  Specifically, ANP counterclaimed for a declaration that it was not obligated to indemnify Millennium for pigment-related claims.  It also alleged that Millennium had made misrepresentations in the 1986 Purchase Agreement which entitled it to set-off any indemnification claims.  Additionally, ANP asserted two causes of action for breach of Millennium's contractual obligation to indemnify ANP.

case, referred to as the Santa Clara Action, was approved by the federal bankruptcy court for the sum of $8.5 million. The London Insurers contributed approximately $2.8 million and Northern Assurance contributed approximately $370,000 (roughly $3.2 million collectively) to Millennium's satisfaction of this settlement. Millennium and ANP then entered into a settlement agreement to resolve their claims in this action, under which ANP agreed to pay Millennium $3 million in satisfaction of all claims between them, and to terminate any obligations under the Amended Purchase Agreement. The settlement agreement did not impact the Insurers' subrogation rights under the 1986 Purchase Agreement.

Following execution of that settlement agreement, Supreme Court granted the London Insurers' earlier motion to intervene in this action, and thereafter Millennium and the London Insurers filed a second amended complaint. The London Insurers sought a declaration that they were entitled to subrogate (both equitably and contractually) to Millennium's indemnification rights in the 1986 Purchase Agreement and, as a result, recover from ANP amounts that were paid by the London Insurers on behalf of Millennium in connection with the Lead Cases.[11] At that juncture, the London Insurers' claim against ANP for subrogation was the only remaining claim in this action, as ANP and Millennium's settlement resolved the claims between

---

[11] The Insurers assert that they have paid over $15 million to Millennium in connection with the Lead Cases.

them.  Later, Northern Assurance joined this action as a
plaintiff when its separate indemnification action against ANP,
seeking its contribution to the Santa Clara Settlement, was
consolidated with this action.  The Insurers moved for partial
summary judgment on liability and ANP cross-moved for summary
judgment dismissing the complaints.[12]  Specifically, as relevant
here, ANP argued, and the courts below agreed, that the Insurers'
subrogation claim was barred by the exception to subrogation --
the antisubrogation rule.  Although Supreme Court determined that
under the 1986 Purchase Agreement ANP was not an insured, it
concluded that because the Insurers sought to recover for the
very risk they insured, the antisubrogation rule would prohibit
the Insurers' right of subrogation.  The Appellate Division
affirmed for the reasons stated by Supreme Court (see 121 AD3d
444 [1st Dept 2014]), and we now reverse.

--------

[12]  Prior to oral argument on the summary judgment motions
in Supreme Court, an Ohio state trial court decided a pending
action, wherein the Insurers sought to recoup their respective
contributions to the Santa Clara Settlement from Millennium.  The
court held that the Insurers' settlement payment in the Santa
Clara action was not required under the relevant policies, and
thus was a voluntary payment.  The court there reasoned that
because the nuisance claim advanced by the Santa Clara plaintiffs
was for "remediation of a public health hazard" not "an action
for damages for injuries caused to plaintiffs' property,"
coverage for that claim was unavailable because the policies
issued by the Insurers covered property damage, rather than
public health hazards.  Thus, the court concluded that because
the Insurers were not required to make the settlement payment,
they were not entitled to reimbursement from Millennium of their
$3.2 million contribution.  The Insurers did not appeal this Ohio
court order.

II.

Subrogation, generally, may arise either contractually or under the doctrine of equitable subrogation.  The purpose of subrogation is to "allocate[] responsibility for the loss to the person who in equity and good conscience ought to pay it, in the interest of avoiding absolution of a wrongdoer from liability simply because the insured had the foresight to procure insurance coverage" (North Star Reins. Corp. v Continental Ins. Co., 82 NY2d 281, 294 [1993]).  Equitable subrogation "'entitles an insurer to stand in the shoes of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse'" (ELRAC, Inc. v Ward, 96 NY2d 58, 75 [2001], quoting North Star Reins. Corp., 82 NY2d 281, 294 [1993] [additional internal quotation marks omitted]).  Subrogation rights may also be preserved by the parties to a contract -- as is the case in some of the insurance policies at issue here.

However, the antisubrogation rule is an exception to the right of subrogation (see Pennsylvania Gen. Ins. Co. v Austin Powder Co., 68 NY2d 465, 468 [1986]).  Under that rule, "an 'insurer has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered . . . even where the insured has expressly agreed to indemnify the party from whom the insurer's rights are derived'"

(ELRAC, Inc., 96 NY2d at 76, quoting Pennsylvania Gen. Ins. Co., 68 NY2d at 468).  In effect, "an insurer may not step into the shoes of its insured to sue a third-party tortfeasor . . . for damages arising from the same risk covered by the policy" (ELRAC, Inc., 96 NY2d at 76), even where there is an express subrogation agreement (see Jefferson Ins. Co. of N.Y. v Travelers Indem. Co.,92 NY2d 363, 373 [1998]).  The two primary purposes of the antisubrogation rule are to avoid "a conflict of interest that would undercut the insurer's incentive to provide an insured with a vigorous defense" and "to prohibit an insurer from passing its loss to its own insured" (id.).

Insurers are barred under the antisubrogation rule from seeking subrogation from a named insured or additional insureds (see Pennsylvania Gen. Ins. Co., 68 NY2d at 471).  Conversely, subrogation is typically permissible where the third party is not a named or additional insured (see e.g. St. John's Univ., N.Y. v Butler Rogers Baskett Architects, P.C., 92 AD3d 761, 764 [2d Dept 2012]; Utica Mut. Ins. Co. v Brooklyn Navy Yard Dev. Corp., 52 AD3d 821, 822-823 [2d Dept 2008]; Insurance Corp. of N.Y. v Cohoes Realty Assoc., L.P., 50 AD3d 1228, 1230 [3d Dept  2008]).  In Jefferson Ins. Co., however, where an insurer sought subrogation against a permissive operator of a covered vehicle, we held that the antisubrogation rule applied even though the permissive user was not specifically named as an insured or an additional insured, and despite the operator's agreement to

indemnify the named insured.  We reasoned that, although the operator was not named on the policy, the operator qualified as an insured because the policy covered permissive users of the vehicle, and that the distinction between a named insured and a permissive user was "immaterial for purposes of application of the antisubrogation rule" (id. at 375).  Accordingly, we concluded that application of the antisubrogation rule was appropriate, observing that the insurer "should not [have] be[en] surprised to pay claims that it covered" (id.).

The antisubrogation rule, therefore, requires a showing that the party the insurer is seeking to enforce its right of subrogation against is its insured, an additional insured, or a party who is intended to be covered by the insurance policy in some other way, such as the permissive user in Jefferson.  Here, as recognized by the courts below, ANP and its predecessor were not insured under the relevant insurance policies.  When SCM transferred the assets and liabilities of its paints business to HSCM-6 (ANP's predecessor), the insurance policies that had applied to SCM were specifically excluded from that distribution. The insurance policies were placed in HSCM-20, a predecessor of Millennium.  Hence, ANP was never insured by the Insurers.  Thus, the principal element for application of the antisubrogation rule -- that the insurer seeks to enforce its right of subrogation against its own insured, additional insured, or a party intended to be covered by the insurance policy -- is absent.

Despite concluding, as we do here, that ANP was not insured by the Insurers, the courts below determined that, based on Jefferson, the antisubrogation rule should apply. However, our holding in that case did not extend application of the antisubrogation rule to non-insured parties, for in Jefferson, the vehicle operator was insured as a permissive user because the policy expressly covered permissive users. In this case, ANP was not covered by the Insurers, and thus Jefferson is distinguishable.

The essential element of the antisubrogation rule is that the party to which the insurer seeks to subrogate is covered by the relevant insurance policy. The rule also requires that the insurer seek to enforce its right of subrogation against that covered party on a risk insured by the policy (see Pennsylvania Gen. Ins. Co., 68 NY2d at 468). If we were to extend application of the antisubrogation rule to all non-covered third parties, an insurer who fulfills its obligation to pay on the risks insured by the relevant policy would essentially be foreclosed from the ability to subrogate. For this reason it is essential, absent a policy reason supporting application of the antisubrogation rule, that the third party against whom the insurer seeks to exercise its right of subrogation is not covered by the relevant insurance policy.

The contexts in which courts of this state have extended the antisubrogation rule to third parties who are not

covered by the insurance policy are limited and distinguishable from this circumstance.  The application of the antisubrogation rule in those cases was primarily based on a policy concern -- namely, the existence of a conflict of interest, one of the primary purposes underlying the antisubrogation rule.  Thus, the antisubrogation rule has been applied by the Appellate Division Departments to an insured's employee for whom the insured is vicariously liable (see Medical Liab. Mut. Ins. Co. v Schurig, 211 AD2d 518, 518 [1st Dept 1995], lv denied 86 NY2d 703 [1995]), an insured property owner's real estate managers (see Kerr v Louisville Hous., 2 AD3d 924, 927 [3d Dept 2003]), and the president and principal shareholder of a closely held corporation (see Fireman's Ins. Co. of Newark, N.J. v Wheeler, 165 AD2d 141, 144-145 [3d Dept 1991]).  Here, however, the policy concerns underpinning the antisubrogation rule are not implicated as no conflict of interest arises.  Since ANP is not an insured, there is no risk that the Insurers will shirk their obligation to one insured in favor of the other.  There is no reason to apply the antisubrogation rule under these facts, and the courts below erred in granting ANP's motion for summary judgment on that basis.

Accordingly, the order of the Appellate Division should be reversed, with costs, ANP's motion for summary judgment on its antisubrogation defense is denied, and the case remitted to the Appellate Division for consideration of issues raised but not

determined on the appeal to that court.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, with costs, motion by The Glidden Company n/k/a
Akzo Nobel Paints LLC for summary judgment on its antisubrogation
affirmative defense denied and case remitted to the Appellate
Division, First Department, for consideration of issues raised
but not determined on the appeal to that court.  Opinion by Judge
Abdus-Salaam.  Chief Judge DiFiore and Judges Pigott, Rivera,
Stein and Fahey concur.  Judge Garcia took no part.


Decided May 5, 2016