■ MILLENNIUM HOLDINGS LLC, Plaintiff, and THE NORTHERN ASSURANCE COMPANY OF AMERICA et al., Appellants, v THE GLIDDEN COMPANY, Now Known as AKZO NOBEL PAINTS, et al., Respondents. [46 NYS3d 528]—

Upon remittitur from the Court of Appeals (27 NY3d 406 [May 5, 2016]), order, Supreme Court, New York County (Shirley Werner Kornreich, J.), entered November 26, 2013, which granted defendants the Glidden Company, now known as Akzo Nobel Paints LLC and Akzo Nobel Paints LLC's (collectively ANP), motion for summary judgment dismissing the complaint, modified, on the law, to remand for a limited determination of whether the insurers are entitled to recover defense costs as against ANP on the basis of express subrogation, and otherwise affirmed, without costs.

## Background

### The Original Glidden and SCM

The original Glidden was an Ohio corporation that manufactured and sold lead-based paints and coatings. In 1924, Glidden acquired Euston Lead Company, a producer of lead pigments used in paints. The lead pigment was a key ingredient in Glidden's lead paint, which was sold under the Glidden name for four decades. In 1958, Glidden sold the lead pigment operation to Dumont Airplane and Marine Instruments, Inc. and exited the lead pigment business. Within several years it stopped selling paint containing lead.

In 1967, Glidden was acquired by and merged into SCM Corporation. Glidden's paint business was housed in SCM's Glidden-Durkee Division. In 1976, the paint business was transferred to the Coatings & Resins Division. The pigments

business—limited to non-lead pigments following the sale of Euston—was placed in the chemical/metallurgical division of SCM.

## The Insurance Policies

Certain Underwriters at Lloyd's, London and certain London market insurance companies (London), subscribed to primary and excess policies in favor of Glidden and SCM's Glidden-Durkee Division for the period from 1962 to 1970. Plaintiff Northern Assurance Company of America's predecessor issued an excess policy to SCM for the period June 27, 1968 to January 1, 1970. The policies covered liability for property damage sustained during the policy period. The primary policy issued between 1965 and 1968, to which the excess policies followed form, contained the following express subrogation clause: "Subrogation: Upon payment of any claim, demand, suit or judgment covered hereby the Underwriters (or other insurers or the Assured in the event that more than one insurer or the Assured as self-insurer has paid any part of such claim it being understood that other insurance or excess insurance or self-insurance is permitted) shall be subrogated to all rights which the Assured may have against any and every person, partnership or corporation in respect of such claim, demand, suit or judgment."

## Hanson Acquisition

In 1985, Hanson Trust PLC attempted a hostile takeover of SCM. As part of an effort to thwart the takeover, SCM in September 1985 transferred the assets of the domestic pigments business to ABC Chemicals, a newly-formed and wholly-owned subsidiary of SCM.

In 1986, Hanson succeeded in acquiring SCM in a hostile takeover. The plan of liquidation and dissolution distributed the company's remaining assets and liabilities among 20 "fan companies" known as HSCM 1 through 20. The paints, resins, coatings, caulking and adhesives business (i.e., the Coatings & Resins Division) was transferred to HSCM-6. The memorandum of distribution in liquidation between SCM and HSCM-6 provided that "HSCM-6 hereby assumes all of the obligations and liabilities relating to the Business, including all claims, whether asserted or unasserted, known or unknown, contingent or otherwise . . . attributable to all periods prior to the date hereof."

By another memorandum of distribution in liquidation, SCM distributed to HSCM-20 the assets "constitut[ing] all the remaining assets of SCM" that had not been transferred to other fan companies. Those assets included the stock of the

new fan company subsidiaries, as well as the stock of ABC Chemicals, which then owned the pigments business. HSCM-20 assumed all of the obligations and liabilities related to such assets.

Thus, HSCM-20 separately owned both SCM's paint business (HSCM-6) and SCM's pigment business (ABC Chemicals).

Asset Purchase Agreement

Shortly thereafter, HSCM-20 sold HSCM-6 to ICI American Holdings, a subsidiary of Imperial Chemical Industries, PLC. The sale was memorialized in a purchase agreement dated August 14, 1986. HSCM-6 was later renamed "The Glidden Company," the predecessor of defendant ANP herein.

Under the asset purchase agreement, Millennium Holdings LLC and its predecessors were required to indemnify ANP and its predecessors from 1986 through 1994 for liabilities arising out of or resulting from "environmental events or environmental conditions" resulting from the use, manufacture, handling, etc., of "materials, substances or wastes in, about or relating to the Business, including, without limitation, the paints, coatings, resins, adhesives, caulkings or related businesses owned or held by any predecessor entity ('Predecessor Business') or formerly owned or held by Seller, HSCM-6, any of the Subsidiaries or any predecessor of any of the foregoing ('Former Business'), and to indemnify ANP in respect of any personal injury or property damage claims of or relating to the Business, the Predecessor Business or the Former Business."

ANP and its predecessors were required to indemnify Millennium and its predecessors thereafter "against and in respect of [claims] . . . relating to the Business arising from or relating to acts, omissions, events or conditions of or relating to the Business, the Predecessor Business or the Former Business occurring or existing prior to, on or after the Closing or otherwise arising out of or relating to the conduct of the Business, the Predecessor Business or the Former Business . . . for matters referred to in Section 9.1 (b) [i.e., environmental liabilities], 9.1[c] [i.e., personal injury and property damage claims], and 9.1 (e) [i.e., other claims]."

Lead Paint Litigation

Beginning in 1987, a number of lawsuits were filed against ANP (the paint company) and Millennium (the pigment company), alleging property damage, personal injuries, and/or public nuisance arising from the presence of old lead paint in inner city housing.

From 1986 onward, Millennium indemnified ANP in accor-

dance with the asset purchase agreement. Shortly before the end of Millennium's indemnification period, a dispute arose as to the scope of ANP's obligations (scheduled to commence in 1994 under the terms of the asset purchase agreement). ANP argued that it was not obligated to provide Millennium with indemnification for "pigment cases," but rather, only paint cases, contending that "pigment cases" fell outside the scope of the indemnity.

The dispute led to litigation in Ohio (*Glidden Co. v HM Holdings*, Ohio Ct of Common Pleas, 1994, case No. 269218) and New York (*HM Holdings, Inc. v ICI Am. Holdings & The Glidden Co.*, Sup Ct, NY County, 1994, index No. 110533/94). Both litigations were settled in 2000 with the parties executing an amended purchase agreement. Millennium assumed the rights and obligations of HSCM-20, including the pigment business, and ANP assumed the rights of ICI and ICI American (HSCM-6), including the paint business. The settlement left open the parties' indemnification obligations regarding the lead paint cases.

Between 1995 and 2000, the insurers paid defense costs for and on behalf of both Millennium and ANP for their joint defense of the lead litigation cases. The insurers terminated funding in 2000 and sought a declaration in Ohio state court that they were not required to provide ANP with a defense and indemnification in the lead cases. In 2006, the Ohio Supreme Court held that ANP was not covered under the relevant policies since it was not a named insured and was not the corporate successor to HSCM-20, the entity holding the policies following the liquidation and distribution of SCM's assets (*Glidden Co. v Lumbermens Mut. Cas. Co.*, 112 Ohio St 3d 470, 861 NE2d 109 [2006]).

The insurers entered into a new defense funding agreement with Millennium only. In 2011, the insurers paid $3.2 million to Millennium toward the settlement of an action brought by the State of California alleging that a public nuisance had been created by the presence of lead paint in California buildings (the Santa Clara action). The insurers' payment in the Santa Clara action was made pursuant to a full reservation of rights, including the right to seek reimbursement from Millennium if there were no coverage. The insurers then brought a coverage action in Ohio seeking a declaration that the Santa Clara action was not covered by the policies. In an order entered August 8, 2013, the trial court in Ohio ruled in favor of the insurers, ruling that the Santa Clara action was not covered by the policies. The court reasoned that "whether

property damage occurred or not by the Millennium Plaintiffs' product [wa]s irrevelant," since the California Court of Appeals had ruled that property damage was not an element of the claim for public nuisance, eliminating any possibility that Millennium would be held liable for property damage. The court declined to adopt a "continuous trigger" theory of recovery (which would have implicated more years of policy coverage). The court declined to permit the insurers to recover the $3.2 million payout from Millennium, finding that an insurer could not create a right to reimbursement from its insured based solely on a unilateral reservation of a right to seek repayment over an explicit objection by the insured (see *Millennium Holdings LLC v Lumbermens' Mut. Cas. Co.*, Cuyahoga County, 2013, case No. 00-CV-411388 at 8-11).

The Instant Litigation

In 2008, Millennium commenced this action seeking indemnification from ANP for fees and claims associated with the lead cases. The insurers' motions to intervene in the action were granted. In 2010, Millennium declared bankruptcy and settled its dispute with ANP. The settlement preserved the insurers' subrogation rights.

Following the settlement in the Santa Clara action, the London insurers sought a declaration that they were entitled to subrogate (both equitably and contractually) to Millennium's indemnification rights in the 1986 asset purchase agreement and to recover from ANP amounts they had paid on behalf of Millennium in connection with the lead paint cases.

The insurers moved for partial summary judgment on liability, asserting that they were entitled to recover the $3.2 million payment they had made toward settlement of the Santa Clara action, as well as defense costs incurred in other lead paint litigations. ANP cross-moved for summary judgment dismissing the complaint on the ground, inter alia, that the insurers' subrogation claim was barred by the antisubrogation rule.

The motion court denied the insurers' motion and granted ANP's motion. The motion court reasoned that while ANP was obligated to indemnify Millennium for its losses related to the lead paint litigations, the "anti-subrogation rule" precluded the insurers from recovering from ANP the payments the insurers had made on Millennium's behalf. The court reasoned that the insurers, by seeking to enforce their subrogation rights against ANP, were seeking to recover for the very risk they had insured in the underlying lead cases. We affirmed (121 AD3d 444 [1st Dept 2014]).

The Court of Appeals reversed (27 NY3d 406 [2016]). Justice

Abdus-Salaam, writing for the Court, reasoned that since ANP and its predecessor were not insured under the relevant insurance policies (as noted, supra, the insurance policies were transferred to HSCM-20, the predecessor to Millennium, and not HSCM-6, the predecessor to ANP), "the principal element for application of the antisubrogation rule—that the insurer seeks to enforce its right of subrogation against its own insured, additional insured, or a party intended to be covered by the insurance policy"—was absent (27 NY3d at 416). The Court remitted the matter for consideration of issues raised but not determined on the prior appeal. Those issues include whether the insurers have a right to subrogate to Millennium's indemnification rights as set forth in the asset purchase agreement, the scope of any such indemnification obligation, and whether the insurers' payment in the Santa Clara action is barred by the voluntary payment doctrine.

Discussion

Subrogation

The right to equitable subrogation accrues when an insurer can establish that it has paid for "losses sustained by its insured that were occasioned by a wrongdoer" (*Fasso v Doerr*, 12 NY3d 80, 86 [2009]; *Winkelmann v Excelsior Ins. Co.*, 85 NY2d 577 [1995]).

The insurers argue that they have a right to equitably subrogate to Millennium's rights under the indemnification, relying on *National Sur. Co. v National City Bank of Brooklyn* (184 App Div 771 [1st Dept 1918]); ANP disagrees, asserting that under New York law a party may not proceed by way of equitable subrogation against a third party whose liability exists by way of contract.

We are compelled to agree with ANP. The Court of Appeals distinguished *National Sur. Co.* in *Federal Ins. Co. v Arthur Andersen & Co.* (75 NY2d 366 [1990]), stating "arguably a compensated insurer or surety should in fairness bear the loss where the third party's liability is solely contractual and not based on fault" (*id.* at 377; *see also National Union Fire Ins. Co. v Ranger Ins. Co.*, 190 AD2d 395, 398 [4th Dept 1993] ["(b)ecause National attempts to assert a right to equitable subrogation against Ranger, a third party that was not negligent and did not cause El Kam's loss, based solely on Ranger's contractual liability," the doctrine of equitable subrogation did not apply]).

ANP is not a third-party wrongdoer, but a party whose liability arises by contract. The insurers accordingly may not rely on a theory of equitable subrogation to pursue claims against ANP.

Contractual Subrogation

A possible theory of liability—but only as to those policies in effect from 1965 to 1968 which contain an express subrogation clause—is contractual subrogation.

The parties dispute the meaning and scope of the relevant indemnification provisions of the asset purchase agreement. The insurers assert that the indemnity extends to the lead paint litigations; ANP asserts that the indemnification was never intended to cover so-called "pigment," as opposed to "paint," cases.

A court will not find a duty to indemnify unless a contract manifests "a clear and unmistakable intent to indemnify" for particular liabilities (*Commander Oil Corp. v Advance Food Serv. Equip.*, 991 F2d 49, 51 [2d Cir 1993] [internal quotation marks omitted]). The indemnity obligation will be strictly construed, and additional obligations may not be imposed beyond the explicit and unambiguous terms of the agreement (*see Hooper Assoc. v AGS Computers*, 74 NY2d 487, 491-492 [1989]).

The indemnification provisions of the agreement define "predecessor" and "former" businesses broadly as "the paints, coatings, resins, adhesives, caulkings or related businesses owned or held by any predecessor entity ('Predecessor Business') or formerly owned or held by Seller, HSCM-6, any of the Subsidiaries or any predecessor of any of the foregoing ('Former Business')."

The indemnification on its face does not purport to distinguish between pigment and paint-based liabilities in the manner suggested by ANP. While the pigment/paint distinction was of concern in the underlying litigations, the indemnity provisions were likely drafted broadly because the eventual liabilities of the corporate successors could not be contemplated with certainty. Indeed, as the motion court observed, "The bottom line is that the paint contained lead, and it was the lead that caused personal injuries, property damage, and public nuisances, not the 'paint' or the 'pigment' " (41 Misc 3d 1231[A], 2013 NY Slip Op 51947[U], *6 [Sup Ct, NY County 2013]).

This does not end the inquiry, however. An indemnification provision must be read in conjunction with the other provisions of the agreement (*see Promuto v Waste Mgt., Inc.*, 44 F Supp 2d 628, 650 [SD NY 1999]). The asset purchase agreement as a whole contemplates that Millennium will maximize its insurance coverage before seeking indemnity from ANP, and that ANP will receive the benefits of Millennium's coverage under the policies. The subject policies, let us not forget, are occur-

rence policies that cover liabilities arising when both companies were owned by the same parent, SCM.

The side letter agreement provides that "Hanson shall give ICI [predecessor to ANP] and its subsidiaries the benefit of any policy of insurance to the extent the same would provide coverage for liability in respect of occurrences relating to the Business prior to Closing giving rise to loss, injury or damage thereafter subject to indemnity on costs." This provision would arguably be rendered meaningless if ANP were required to repay the insurers through subrogation.

Section 2 of the lead litigation agreement (incorporated by reference into the asset purchase agreement) includes an express undertaking by Millennium to share with ANP insurance proceeds relating to litigation conducted in the common defense, to assign ANP choses in action for insurance coverage, and to "use [its] best efforts to maximize any and all insurance recoveries under the Insurance Policies."[1]

The Ohio Supreme Court's ruling that the side letter agreement did not cause the paint company (now ANP) to maintain coverage under the subject insurance policies answers the question of whether ANP could seek payment directly from the insurers. It does not address the present situation, where the insurers seek to proceed against ANP via subrogation and we are asked to construe the meaning of an indemnification agreement. The Ohio Supreme Court did not "invalidate" the side letter agreement in the manner suggested by the partial dissent; rather, it held that the parent company had not effectuated a transfer of insurance coverage on behalf of its subsidiary.

Given the ambiguities in the relevant agreements, we cannot find as a matter of law that the insurers are entitled to contractually subrogate to ANP's indemnification rights. On remand, the motion court is to consider the intent of these provisions in light of the extrinsic evidence.

Voluntary Payment

The insurers' payment of $3.2 million to Millennium on account of the Santa Clara action was a "voluntary payment" precluding the exercise of the insurers' subrogation rights. It is axiomatic that a right of subrogation exists only for payments an insurer is contractually obligated to pay (*see Broadway Houston Mack Dev., LLC v Kohl*, 71 AD3d 937 [2d Dept 2010]).

---

**1.** Although this agreement was terminated in 2002, it extends to defense costs in respect of claims that were incurred prior to the effective date of the termination. Further, it does not address the question of whether ANP agreed to pay Millennium's insurers.

The Ohio court having already determined that the Santa Clara action is outside the scope of the policy coverage, the insurers have no right to recover the payment made on behalf of their insured (*see National Union Fire Ins. Co. v Ranger Ins. Co.*, 190 AD2d at 397-399). At the time the payment was made, the insurer was not acting under any mistake of fact or law (*see id.*) Thus, the insurer became a mere volunteer, and the $3.2 million paid is outside the scope of any right to subrogation (*see Broadway Houston Mack Dev., LLC v Kohl*, 71 AD3d at 937-938).

The fact that ANP did not plead the voluntary payment doctrine as an affirmative defense is irrelevant. Proof that the payment was legally compelled was part of the insurers' prima face case to establish a right to subrogation (*see id.*).

### Conclusion

The insurers are not entitled to proceed by way of equitable subrogation. The insurers may not recover the $3.2 million payment in settlement of the Santa Clara action. On remand, the motion court is to construe the relevant indemnification obligations set forth in the asset purchase agreement and to determine whether the insurers may proceed on a contractual subrogation theory with respect to those policies containing an express subrogation clause (1965-1968). Concur—Renwick, Moskowitz and Manzanet-Daniels, JJ.

Sweeny, J.P., and Andrias, J., dissent in part in a memorandum by Andrias, J., as follows: Appellant insurance companies claim that they are entitled to be subrogated (both equitably and contractually) to the right of their insured, plaintiff Millennium Holdings LLC (Millennium), to indemnification from defendant the Glidden Company, now known as Akzo Nobel Paints (ANP), for the amounts they expended on behalf of Millennium in certain lead paint related cases.[1] While agreeing with the insurers that the contractual indemnity provision at issue applies, the motion court granted summary judgment to ANP on the ground that the insurers' claims were barred by the antisubrogation rule because they sought to recover for the very risk they insured (*see* 41 Misc 3d 1231[A], 2013 NY Slip Op 51947 [U] [Sup Ct, NY County 2013]). This Court affirmed for the reasons stated by the motion court (*see* 121 AD3d 444 [1st Dept 2014]). The Court of Appeals reversed and remitted to this Court for consideration of issues raised but not determined on the appeal, holding that the antisubrogation rule did not apply to a claim against ANP, a related successor company that was never an insured (*see* 27 NY3d 406 [2016]).

---

1. Millennium and ANP have settled their claims in this action against each other.

On remittitur, I agree with the majority that the insurers may not proceed by way of equitable subrogation against ANP, a third party whose liability exists by way of contract, and that the insurers' payment of $3.2 million to settle the "Santa Clara" action was a "voluntary payment," precluding the exercise of the insurers' subrogation rights with respect thereto. However, I do not agree with the majority that the matter should be remanded to Supreme Court for a limited determination of whether the insurers are entitled to recover defense costs as against ANP on the basis of an express subrogation agreement. Contrary to the view of the majority, the indemnity agreement is not ambiguous and supports the insurers' claim for indemnification for defense costs with respect to policies that contain a subrogation clause.

The original Glidden Company (Old Glidden) manufactured and sold lead paints and lead pigments used in paints. In 1958, it stopped manufacturing lead pigment, but continued to manufacture and sell paint containing lead. In 1967, it was acquired by and merged into SCM Corporation (SCM), which placed the paint business into its "Glidden-Durkee" division. Between 1962 and 1970, primary and excess insurance policies were issued to Old Glidden and the Glidden-Durkee division by the insurers or their predecessors for property damage liability arising from lead in their products. The policies in effect from 1965-1968 contained a subrogation clause.

In 1985, SCM transferred its pigments business (which no longer involved lead) to a new subsidiary, ABC Chemicals Inc. (ABC). In 1986, Hanson Trust PLC (Hanson) acquired SCM, whose assets and liabilities were transferred to 20 "fan companies," entitled HSCM 1 through 20. The paint business went to HSCM-6 but the insurance policies were excluded from the transfer. The stock of HSCM-6 and all remaining undistributed assets of SCM were placed in HSCM-20, including ABC and the insurance policies.

In 1986, HSCM-20 sold the stock in HSCM-6 to ICI American Holdings (ICI) (the 1986 agreement). HSCM-20 retained the insurance policies. Under section 9.1 (c) of the 1986 agreement, HSCM-20 agreed to indemnify ICI for an eight-year period between 1986 and 1994 for claims arising from "product safety or liability . . . , health or welfare conditions or matters arising from or relating to acts, omissions, events or conditions of or relating to the Business, the Predecessor Business or the Former Business occurring or existing prior to the Closing or otherwise arising out of or relating to the conduct of the Business, the Predecessor Business or the Former Business prior to the Closing."

After 1994, the indemnification obligation flipped, with section 9.3 providing that ICI would indemnify HSCM-20 "from, against and in respect of any Claims . . . relating to the Business arising from or relating to acts, omissions, events or conditions of or relating to the Business, the Predecessor Business or the Former Business occurring or existing prior to, on or after the Closing or otherwise arising out of or relating to the conduct of the Business, the Predecessor Business or the Former Business prior to, on or after the Closing arising against Indemnitees for matters referred to in Section 9.1 (b), 9.1 (c) or 9.1 (e) to the extent that [ICI] would not be entitled to indemnity under Sections 9.1 [4] and 9.2 [5]."

Hanson and ICI also entered into a side letter agreement that provided that "Hanson shall give ICI and its subsidiaries the benefit of any policy of insurance to the extent the same would provide coverage for liability in respect of occurrences relating to the Business prior to Closing giving rise to loss, injury, or damage thereafter subject to indemnity on costs."

In 1987, multiple lead paint lawsuits were filed against the predecessors of Millennium and ANP. Between 1987 and 1994, Millennium's predecessors indemnified ANP's predecessors for defense costs pursuant to section 9.1 (c) of the 1986 agreement. In 1994, when the indemnity obligation flipped, ANP's predecessor (ICI) refused to indemnify Millennium's predecessors (Hanson and HSCM-20), resulting in litigation between them in New York and Ohio state courts.

In 2000, that litigation settled. Pursuant to a settlement agreement and three additional agreements attached as exhibits thereto, including "The Lead Litigation Agreement," an amended purchase agreement (APA) was formed under which Millennium assumed the rights and obligations of Hanson and HSCM-20 and ANP assumed the rights and obligations of ICI. Accordingly, the pigment business went to Millennium and the paints business went to ANP. Further, in the lead litigation agreement, the parties agreed to continue their prior practice of sharing equally the costs associated with defending lead litigation cases in which both parties were defendants, without prejudice to later indemnification claims.

Subsequently, the London Insurers terminated that agreement and sought a declaration in Ohio state court that they were not required to provide ANP with a defense and indemnification. In 2006, the Ohio Supreme Court held that ANP was not covered under the relevant policies "by operation of law or by contract," as it was not a named insured and its subsequent purchase of HSCM-6 included an assumption of liabilities (*see*

*Glidden Co. v Lumbermens Mut. Cas. Co.*, 112 Ohio St 3d 470, 470, 474-475, 861 NE2d 109, 112, 115-116 [2006]). The decision also invalidated Hanson's side letter agreement attempting to provide ANP's predecessor ICI with the benefits of SCM's insurance policies on the ground that Hanson was not a named insured in the relevant policies and consequently could not transfer them to ICI.

Stating that there is a distinction between "paint cases" and "pigment cases," ANP contends that section 9.3 of the 1986 agreement only applies to "paint cases" since its indemnification obligation was limited to "Claims relating to the Business," and the term "Business" did not refer or relate to the "pigment" business.[2] However, as the majority finds, the plain language of the agreement refutes ANP's arguments.

Section 9.1 (c), identifying the scope of Millennium's indemnification obligations, and section 9.3, identifying the scope of ANP's indemnity obligation, employ substantially similar language and reflect an intent to have the indemnity cover all facets of "The Business," i.e., anything relating to the "developing, manufacturing, marketing, selling, [licensing] and distributing of paints, industrial coatings, resins, caulkings, and adhesives." Moreover, section 9.4, states that, notwithstanding the "foregoing," with respect to any claim "incurred or suffered as a result of any Claim arising out of or in any way related to exposure to materials, substances, wastes, or products manufactured, used, stored, sold, handled, spilled discharged or disposed of by" ANP, or "any of the Subsidiaries or any predecessor entity of the foregoing . . . (iii) if the Claim for exposure becomes first pending later than 8 years after Closing, Buyer [ANP's predecessor] shall indemnify the Indemnitees [Millennium's predecessor] in full." This language indicates that after eight years, the period of 1986-1994, ANP's indemnification obligation was to be as broad as Millennium's was prior to that time. If the parties intended for "paint" claims to be paid for by the "paint" company (then HSCM-6, now ANP) and for "pigment" claims to be paid for by the "pigment" company (then ABC, now Millennium), the agreement could have just said so.

While agreeing that "[t]he indemnification on its face does not purport to distinguish between pigment and paint-based liabilities in the manner suggested by ANP," the majority nevertheless holds that ambiguities in the relevant agreements

---

**2.** As the motion court observed, it appears that the plaintiffs in lead paint cases eventually made the decision to only maintain their cases against pigment companies.

preclude a finding that the insurers are entitled, as a matter of law, to contractually subrogate to Millenium's indemnification rights. In support, stating that the indemnification must be read in conjunction with the other provisions of the relevant agreements, the majority asserts that: (1) the 1986 agreement as a whole "contemplates that Millennium will maximize its insurance coverage before seeking indemnity from ANP, and that ANP will receive the benefits of Millennium's coverage under the policies"; (2) the side letter agreement that provides that ICI (ANP's predecessor) would receive the benefits of the insurance policies "would arguably be rendered meaningless if ANP were required to repay the insurers through subrogation"; and (3) section 2 of the lead defense agreement "includes an express undertaking by Millennium to share with ANP insurance proceeds relating to litigation conducted in the common defense, to assign ANP choses in action for insurance coverage, and to 'use [its] best efforts to maximize any and all insurance recoveries under the Insurance Policies.' " However, none of these three points preclude summary judgment on the issue.

Whether a contract is ambiguous is a question of law for the court and is to be determined by looking "within the four corners of the document" (*Kass v Kass*, 91 NY2d 554, 566 [1998]; *Omansky v Whitacre*, 55 AD3d 373 [1st Dept 2008]). The existence of ambiguity is determined by examining the "entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed," with the wording to be considered "in the light of the obligation as a whole and the intention of the parties as manifested thereby" (*Kass* at 566 [internal quotation marks omitted]).

"A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [internal quotation marks omitted]). A contract is ambiguous if its terms are "susceptible to more than one reasonable interpretation" (*Evans v Famous Music Corp.*, 1 NY3d 452, 458 [2004]). "[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently" (*Mount Vernon Fire Ins. Co. v Creative Hous.*, 88 NY2d 347, 352 [1996]).

ANP's obligation to indemnify Millennium for the defense cost under section 9.3 of the 1986 agreement is not ambiguous. Further, the Court of Appeals' determination in this matter shows that neither the side letter nor any other document conferred insurance rights upon ANP.

The side letter agreement does not immunize ANP from liability for costs that the insurers paid to or on behalf of Millennium. Nothing in the letter, or in the 1986 agreement itself, states that the indemnity is ineffective to the extent that Millennium is able to obtain insurance coverage for the amounts owed by ANP; that Millennium cannot pursue indemnity for covered amounts; or that subrogation claims by insurers for those amounts are waived. Indeed, the Ohio Supreme Court held that the side letter did not convey any rights related to the policies, because Hanson had no rights to give (*see Glidden Co. v Lumbermens Mut. Cas. Co.*, 112 Ohio St 3d at 477, 861 NE2d at 117). Millennium terminated the lead litigation agreement, and told ANP at that time that it would no longer share insurance recoveries even if ANP had agreed to indemnify it for a claim.

Accordingly, I would deny ANP summary judgment insofar as the insurers seek to recover the defense costs.