Lecesse Constr. Servs., LLC v Hudson Excess Ins. Co. (2025 NY Slip Op 50686(U))

[*1]

Lecesse Constr. Servs., LLC v Hudson Excess Ins. Co.

2025 NY Slip Op 50686(U)

Decided on April 30, 2025

Supreme Court, Monroe County

Doyle, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 30, 2025
Supreme Court, Monroe County

Lecesse Construction Services, LLC, Plaintiff,

against
Hudson Excess Insurance Company, Defendants, and The Pike Company, Inc., Additional Defendant on the Counterclaims.

Index No. E2024003268

Anna Mercado Clark, Esq., and Michael R. Staszkiw, Esq., PHILLIPS LYTLE LLP, for the Plaintiff and Counterclaim Defendant The Pike Company, Inc. 
Adam P. Freidman, Esq., CHIESA SHAHINIAN & GIANTOMASI PC, for the Defendant

Daniel J. Doyle, J.

Plaintiff Lecesse Construction Services, LLC (hereinafter "plaintiff') initiated this action in February of 2024 against Defendant Hudson Excess Insurance Company (hereinafter "defendant"), alleging the defendant breached a Subcontractor Default Insurance Reimbursement Policy (hereinafter "policy"). Hudson answered the complaint and asserted counterclaims against the plaintiff and The Pike Company, Inc.[FN1]

The plaintiff (and counterclaim defendant) moves for summary judgment on its 1st through 4th causes of action and to dismiss the defendant's counterclaims. The defendant cross-moves for summary judgment on its counterclaims. For the reasons that follow, the plaintiff's motion is DENIED; the defendant's motion is partially GRANTED and otherwise DENIED.
Relevant Facts
Pleadings
Plaintiff alleged in its complaint that the defendant breached a subcontractor default insurance policy in failing to pay submitted claims and in seeking to recover on payments for claims previously paid. The plaintiff alleged the following causes of action: (1) declaratory judgment (that the policy obligates the defendant to pay the submitted claims; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) declaratory judgment (that the defendant's demands for repayment on previously paid claims violated New York's anti-subrogation rule); and (5) accounting.
The defendant answered the complaint and asserted counterclaims against the plaintiff and The Pike Company, Inc. The defendant alleged the following causes of action: (1) breach of contract; (2) declaratory judgment (that the plaintiff materially breached the contract and the defendant is discharged from any remaining obligations); and (3) breach of contract (failure to pay the Damages Award amount pursuant to the policy).
Parties Stipulated Facts
In September of 2018, plaintiff and the Naval Continuing Care Retirement Foundation Inc., d/b/a Fleet Landing ("Owner") entered into a construction contract (the "Construction Contract") providing that plaintiff serve as construction manager and prime contractor for the Fleet Landing Expansion and Repositioning of its retirement community in Atlantic Beach, Florida (the "Project"). Plaintiff and National Lumber Company, Inc. ("National") entered into a Master Subcontract Agreement dated February 4, 2014 (the "Master Subcontract").
In connection with the Master Subcontract, plaintiff and National entered into a Revised Work Order (the "Revised Work Order"). In the Revised Work Order, National agreed to provide, among other things, labor, services, and materials for wood framing, wood trusses, and sheathing for framing and roof work on certain buildings included in the Project.
On or about August 30, 2018, The Pike Company, Inc. purchased a policy of Subcontractor Default Insurance from defendant, with a policy period of September 1, 2018, through September 1, 2020 (the "SDI Policy").[FN2]
Lecesse is a named insured of the SDI Policy pursuant to an endorsement to the SDI Policy made effective September 1, 2018. Pursuant to another endorsement to the SDI Policy, the Revised Work Order is a "Covered Subcontract" as defined by the SDI Policy.
By letter dated March 17, 2020, plaintiff terminated the Revised Work Order due to National's "failure to correct defective work . . . causing repeated and unremedied delays and expenses." On March 4, 2020, plaintiff provided to defendant a notice of a claim against the SDI Policy relating to National's default (the "National Claim"). Plaintiff submitted 16 Proofs of Loss to the defendant for indemnification of "Loss" (as defined by the Policy) resulting from National's default.
With regard to the first 12 Proofs of Loss the defendant engaged in an adjustment process relative to these Proof of Loss submissions and requested from plaintiff, and received, certain additional documentation and information from plaintiff in response to such requests. The defendant paid $8,078,929.95 to the plaintiff in connection with the first 12 Proof of Loss submissions.
On (or about) May 14, 2020, a demand for arbitration against National was filed with the American Arbitration Association. On (or about) November 12, 2020, the defendant and the plaintiff entered into a Joint Prosecution and Common Interest Agreement regarding their respective rights and obligations with regard to subrogation and the pursuit of recoveries from National.[FN3]
Among other things, the Common Interest Agreement designated Patrick C. Crowell, Esq. (hereinafter "Crowell") as lead counsel in the prosecution of claims against National.
On (or about) November 30, 2020, an amended demand for arbitration was filed against National. On (or about) June 21, 2021, the defendant and the plaintiff executed a First Modification of Joint Prosecution and Common Interest Agreement (the "First Modification"). Among other things, the First Modification added Margaret A. Wharton, Esq., as co-lead counsel for the prosecution of claims against National with Crowell. On (or about) July 7, 2021, a second amended demand for arbitration was filed against National.
The arbitration hearing was held from March 28, 2022, through April 7, 2022. On (or about) July 11, 2022, the arbitration panel (the "Panel") issued an Interim Decision on the Merits of the Dispute (the "Interim Decision"). On (or about) August 30, 2022, the Panel issued their final Award of Arbitrators (the "Final Award"). In the Final Award, the Panel awarded the plaintiff damages in the amount of $2,502,785.88 (the "Damages Award"). The Final Award directed National to pay the Damages Award within 30 days of the date of the Final Award.
After the Final Award, the plaintiff submitted to the defendant three additional Proofs of Loss, on September 14, 2022 (Proof of Loss No. 13), September 20, 2022 (Proof of Loss No. 14), and October 11, 2022 (Proof of Loss No. 15), respectively, which the defendant received.
National's payment of the Damages Award, which it believed it was making by wire transfer pursuant to wire instructions provided by Crowell, was in fact made pursuant to wire instructions provided by an unknown unauthorized actor, and National's payment was diverted to an unauthorized bank account(s) not maintained by Crowell, Ms. Wharton, plaintiff or Pike, and in which none of them had an interest (the "Diverted Wire Transfer"). The federal government has recovered $1,514,860.01 of the Diverted Wire Transfer and released $1,514,860.01 to National. On (or about) February 26, 2024, the defendant, the plaintiff, and National entered into a Stipulation pursuant to which the recovered proceeds of the Diverted Wire Transfer will be paid to the defendant. The defendant, on September 17, 2024, received $1,471,518.51 from National, representing the $1,514,860.01 of the Diverted Wire Transfer that the federal [*2]government recovered less $43,341.50 that National deducted as what it claimed to be its "reasonable costs and expenses".
Thereafter, the plaintiff and the defendant exchanged multiple letters asserting claims against the other, citing language in the SDI Policy. The defendant sought recovery of the Damages Award, and recoupment of the amounts previously funded to the plaintiff under the prior 12 Proofs of Loss (less the recovery of the Damages Award). The plaintiff rejected the defendant's demand and demanded that the defendant pay Proofs of Loss 13, 14, and 15.
Subsequently, the plaintiff submitted another Proof of Loss (denominated # 16).[FN4]

The defendant did not pay any amounts to the plaintiff on the Proofs of Loss 13 through 16. The plaintiff has not repaid to the defendant the amounts sought by the defendant.
Plaintiff's Additional Evidentiary Submissions
Plaintiff submits the affirmation of Robert Rapp. Mr. Rapp avers that he is a partner of a commercial risk construction practice who regularly advises clients on subcontractor default insurance. Mr. Rapp's firm was the broker of record for the plaintiff when it purchased the subcontractor insurance at issue herein. Mr. Rapp further avers that he received an updated subcontractors default insurance policy from the defendant herein (on December 30, 2024). The updated policy is attached as a relevant exhibit to Mr. Rapp's affirmation, and contains a limitation on claims, stating: "[defendant] shall have the right of recovery against the Insured for the difference between any sums paid by the [defendant] and any amounts awarded by a court, arbitrator, or other legally binding authority against a Subcontractor/Supplier."
Defendant's Additional Evidentiary Submissions
The defendant submits the affirmation of Christopher Morkan, the defendant's Claim Director. Mr. Morkan avers that the mediation was initiated by the plaintiff against National prior to the defendant's first payment to the plaintiff on Proofs of Loss 1 through 12, on July 1, 2020, and that the defendant did not subrogate to any of the plaintiff's rights against National until after that date. Mr. Morkan further averred that the plaintiff's attorney, Crowell, did not represent the defendant at the arbitration proceeding against National. Mr. Morkan also averred that the defendant neither directed the arbitration against National, nor participated in the proceedings. Finally, Mr. Morkan averred that the portion of the damages sought by the plaintiff in the arbitration proceeding — related to fraud and negligence claims- would solely benefit the plaintiff and the defendant did not subrogate to those claims.
The defendant also submits the affirmation of Andrew Thompson, Director, SDI Claims for Odyssey Reinsurance Company. He avers that on October 11, 2022 he advised the plaintiff, by letter, that it owed the defendant in excess of $8 million and that the defendant would not be making any further payments on the Proofs of Loss that had been submitted until that amount was paid or the matter was amicably settled.
Relevant Contractual Language [FN5]
1. INSURING AGREEMENT
The Company will indemnify the Insured for Loss after application of the SIR and Co-payment amounts stated in Item 5. and Item 6. of the Declarations and subject to the [*3]Retention Aggregate stated in Item 7. of the Declarations, but only to the extent of the Default of Performance, provided the formal notice of default was issued and reported to the Company prior to the end of the Post Completion Coverage Duration. The amount paid by the Company will be subject to the Limits of Insurance stated in Item 3. of the Declarations.
* * *
6. CLAIMS
a. The Insured bears the burden of proving that it has complied with all the terms and conditions of this Policy and that the Loss is recoverable under this Policy, including the expenditure of those amounts in Items 5. 6. and 7. of the Declarations.
* * *
e. The Company will indemnify the Insured within thirty (30) days of receipt of a satisfactory Proof of Loss. In the event the Insured provides the Company with documentation presented as a Proof of Loss that the Company finds deficient, the Company will notify the Insured of the deficiencies within thirty (30) days after the Company's receipt of such documentation. The Company will make payment for a Loss within thirty (30) days of receipt of information necessary to cure such deficiencies. If the Company notifies the Insured of a deficiency in a Proof of Loss, the Company will pay any covered amount, up to the Each Loss Limit of Insurance as stated in Item 3.a. of the Declarations, for which the Proof of Loss is not deficient.
* * *
g. The Insured must immediately return any payments made by the Company upon a determination by a court, arbitrator, or other legally binding determination that the Loss does not arise out of a Default of Performance.
h. The Proof of Loss and any amounts claimed as covered Loss(es) under this Policy are subject to audit by the Company in accordance with Section 8 Conditions, paragraph i. Inspection and Audit. In the event that the Insured and the Company cannot agree that a claim is a Loss, or cannot agree on the amount of Loss the Insured has incurred or paid, either party may commence proceedings in accordance with Section 8. CONDITIONS, paragraph c., Dispute Resolution, of this Policy.
7. SUBROGATION AND RECOVERIES
a. In the event of any payment by the Company under this Policy, the Company shall receive, to the extent of such payment, all of the Insured's rights of recovery and other remedies against all persons, entities or organizations with respect to such payment.
b. Unless otherwise agreed to by the Company and the Insured, the Company shall, at the Company's option, pursue all recovery and subrogation actions for Losses paid.
c. The Insured must take all reasonable steps to preserve the Company's rights of recovery against the persons, entities or organizations identified in Section 7.a. hereto, and the Insured shall do nothing to prejudice such rights.
d. The Insured must cooperate with the Company in the investigation, settlement or defense of any claim or suit and assist the Company, upon reasonable request, in the enforcement of any right against the person, entity or organization which may be liable to the Insured because of Loss to which this insurance applies, including but not limited to, filing any claims and enforcing any liens or security interest against a Subcontractor/Supplier or its property.
e. After payment of the Loss, any funds or salvage recovered will be paid to the Company and shared between the Insured and the Company in the following order:
i. The Company will be fully reimbursed for the Company's costs of recovery, including but not limited to, attorney fees, expert witness fees, arbitrator fees and court and arbitration costs and expenses;
ii. next, if any funds remain, the Company will be fully reimbursed for the Loss amount the Company paid in excess of the sum of the SIR listed in Item 5. of the Declarations; and
iii. next, if any funds remain and the Insured paid a Co-payment Amount, then the Insured and the Company will share, based on the Co-payment Amount listed in Item 6. of the Declarations, any remaining sums until the amount of the Company's payment of the Loss and the Company's cost of recovery have been fully reimbursed.
Sums remaining after all payments in subparagraphs 7.e.(i) through 7.e.(iii) hereto, if any, shall be retained solely by the Insured. The application of amounts recovered as described above applies regardless of any designation of amounts by the Subcontractor/Supplier or any other party.
8. CONDITIONS
a. Conditions of Coverage
As a condition precedent of coverage provided under this Policy, the Insured warrants and agrees:
* * *
iii. to use all reasonable measures to prevent and to mitigate Loss at all times; and
iv. following the delivery of Notice of Loss to the Company, to execute, upon the Company's request, an assignment of all right, title, and interest arising under any Covered Subcontract or Purchase Order Agreement, including without limitation any legal or equitable claim or chose in action against any Subcontractor/ Supplier to whom the Insured has issued a notice of Default of Performance and to cooperate, in accordance with the terms and conditions of this Policy, in the Company's prosecution of any legal actions the Company deems appropriate against such subcontractor.
* * *
9. DEFINITIONS
* * *
f. Default of Performance means failure of the Subcontractor /Supplier to fulfill the terms of the Covered Subcontract or Purchase Order Agreement as determined by the Insured or a court, arbitrator or arbitration panel, [sic] legally binding authority. A determination by a legally binding authority shall supersede any previous determination.
* * *
l. Loss means Direct Costs and Indirect Costs paid by the Insured to the extent caused by a Default of Performance by a Subcontractor / Supplier under the terms of a Covered Subcontract or Purchase Order Agreement, less (i) the unpaid Balance of the Subcontract or Purchase Order Agreement Price, and (ii) any other amounts retained or recovered by the Insured with respect to the Covered Subcontract or Purchase Order Agreement of the defaulted Subcontractor / Supplier.
* * *
o. Proof of Loss means a written description and any other supporting evidence [*4]reasonably required by the Company, including the applicable Covered Subcontract or Purchase Order Agreement, notice of Default of Performance, and any other documents which demonstrate the claim is a covered Loss and quantify the amount of the Loss.
Arbiters' Decision
As relevant herein, the arbiters determined that National performed substandard work on the project and that the plaintiff was justified in canceling its contract with National and hiring a replacement contractor, US Framing. However, the arbiters determined that the plaintiff failed to mitigate its damages in that it allowed National to perform substandard work for months and it sought to ""claw back" the funds [plaintiff] expended to correct work that should not have been allowed to be performed in the first place, thus failing to mitigate." The arbiters also found that "both [plaintiff] and [National] contributed to the delayed and defective work on this Project (by [National] performing defective work and by [plaintiff] watching it happen time and time again), but the evidence fell short of providing the Panel a sufficient basis to assess the number of days of delay that should be assessed to each party."
The arbiters determined that National breached the contract between it and plaintiff. In so holding, the arbiters held: "[w]e find [National] breached duties and obligations under the parties' Contract regarding the quality of its framing installation work, and that [plaintiff] is entitled to damages for costs to correct defectively installed items of work. However, we are reducing the damages [plaintiff] sought for breach of contract as we find the damages were not sufficiently delineated as to causation." (Emphasis supplied.)[FN6]

As to the plaintiff's damages claim, the arbiters determined that:
We find [plaintiff's] supporting documents lacked details and back-up to show the areas for which US Framing provided labor and services related to [National's] deficient and incomplete work. All items of work were recorded as labor charged against [National] whether it was for completing original scope of work, or making changes to the original design, or repairing defective work by [National], or repairing defective work by US Framing, or repairs made necessary by other trades, or acceleration of the schedule, or delays within the completion schedule, or any other details.
On its face the Panel disagrees with the magnitude of the damages claimed by LCS. [National] worked under an adjusted contract amount of approximately $2,800,000 (for labor after deducting materials purchased directly from [National] by the Owner). [Plaintiff] paid US Framing approximately $7,100,000 for labor to complete the remaining 12% of [National's] incomplete work and to repair [National's] defectively installed work that had been completed. After termination the amount of damages claimed by [plaintiff] for [National's] direct scope of work is 
18 times the contract balance remaining on [National's] contract as acknowledged by [plaintiff].[FN7] This large [*5]unexplained disparity further illustrates the issue the Panel has with the magnitude of [plaintiff's] damages as presented.
We find the time records maintained by [plaintiff] and its management personnel woefully inadequate for us to find [National] responsible for all of the time incurred by US Framing to correct and complete the work. The evidence of the cost to repair NL's defective work, versus completion of [National's] base contract work, and work items that should not have been assessed against [National] was not provided to the Panel.[FN8]
Summary Judgment Standard
A party seeking summary judgment pursuant to CPLR 3212 must make prima facie showing of entitlement to judgment as a matter of law and submit sufficient evidence to demonstrate the absence of any material issue of fact. (Iselin & Co. Inc v Landau, 71 NY2d 420 [1988].) Summary judgment may only be granted when "it has been clearly ascertained that there is no triable issue of fact outstanding; issue finding, rather than issue determination, is its function". (Suffolk County Dep't of Soc. Servs. v James M., 83 NY2d 178, 182 [1994].) Only when the proponent demonstrates entitlement to summary judgment, the opposing party must then demonstrate, generally by admissible evidence, the existence of an issue of fact requiring a trial. (Zuckerman v City of New York, 49 NY2d 851 [1985].)
"'It is equally well established that the motion should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility' (Scott v. Long Is. Power Auth., 294 AD2d 348, 348, 741 N.Y.S.2d 708; see Ruiz v. Griffin, 71 AD3d 1112, 1115, 898 N.Y.S.2d 590)." (Katz v. Beil, 142 AD3d 957, 964 [2nd Dept. 2016].) ""When reviewing a motion for summary judgment the focus of the court's concern is issue finding, not issue determination, and the affidavits should be scrutinized carefully in the light most favorable to the party opposing the motion". (Goldstein v County of Monroe, 77 AD2d 232, 236; Renda v Frazer, 75 AD2d 490.)" (Robinson v. Strong Mem'l Hosp., 98 AD2d 976, 976 [4th Dept. 1983]; see also Gitlin v. Chirinkin, 98 AD3d 561 [2nd Dept. 2012].)
"Here, "[b]y having each sought summary judgment, both parties bore the burden of establishing that their construction of the [agreement] is the only construction which can fairly be placed thereon" (Birdsong Estates Homeowners Assn., Inc. v. D.P.S. Southwestern Corp., 101 AD3d 1735, 1736, 957 N.Y.S.2d 785 [4th Dept. 2012] [internal quotation marks omitted]; see Jellinick, 296 AD2d at 78-79, 744 N.Y.S.2d 610)." (Rivera-Ortiz v. Cook, 225 AD3d 1145, 1147 [4th Dept. 2024].)
Summary of Arguments
Plaintiff argues that the defendant breached the policy in failing to pay Proofs of Loss 13 through 16 in that the relevant contractual language requires the defendant to pay withing thirty (30) days of submission or notify the plaintiff that there were deficiencies in the proofs. In failing to remit payment, the plaintiff argues that the defendant breached the contract and [*6]breached the implied covenant of good faith and fair dealing.
Plaintiff also argues that the defendant's counterclaims should be dismissed as recovery of the amounts the defendant paid to the plaintiff under the policy would violate New York's anti-subrogation rule and otherwise waived reimbursement after making payment on the prior claims. Finally, plaintiff argues that the defendant's claim for an award of the Damages Award must be dismissed as it is contingent on a future determination as to whom is liable for that payment.
The defendant argues that the plaintiff violated the SDI Policy in failing to mitigate its damages when National defaulted, and in failing to repay $5,576,144 in funds previously advanced to the plaintiff as the arbiters determined that those funds were not payable as a result of National's default in performance. The defendant argues further that the plaintiff's breach of the SDI policy (in not repaying the funds) was a material breach of the contract, thus relieving the defendant from paying the Proofs of Loss 13 through 16.
The Defendant's Summary Judgment Motion is Partially Granted; the Plaintiff's is Denied
Relevant Law Related to Contractual Interpretation
"It is well settled that a contract must be read as a whole to give effect and meaning to every term (see Village of Hamburg v American Ref-Fuel Co. of Niagara, 284 AD2d 85, 89 [2001], lv denied 97 NY2d 603 [2001]). Indeed, "[a] contract should be interpreted in a way [that] reconciles all [of] its provisions, if possible" (Green Harbour Homeowners' Assn., Inc. v G.H. Dev. & Constr., Inc., 14 AD3d 963, 965 [2005]; see Village of Hamburg, 284 AD2d at 89)." (New York State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C., 78 AD3d 1566, 1567 [4th Dept. 2010].) "Moreover, the contract must be interpreted so as to give effect to, not nullify, its general or primary purpose (see, Williams Press v State of New York, supra, at 440; Murray Oil Prods. v Royal Exch. Assur. Co., 21 NY2d 440, 445, mot to amend remittitur granted 22 NY2d 722)" (Reda v Eastman Kodak Co. [appeal No. 2], 233 AD2d 914, 914-915)." (Vill. of Hamburg v. Am. Ref-Fuel Co. of Niagara, L.P., 284 AD2d 85, 89 [4th Dept. 2001].)
"Whether or not a contract is ambiguous is a question of law to be resolved by the courts (see Matter of Banos v Rhea, 25 NY3d 266, 276 [2015]; Kass v Kass, 91 NY2d 554, 566 [1998]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). In deciding that question, judges must compare the competing interpretations advanced by the parties to the contractual language, which represents "[t]he best evidence" of the parties' intent (Greenfield v Philles Records, 98 NY2d 562, 569 [2002] [internal quotation marks omitted])." (MAK Tech. Holdings Inc. v. Anyvision Interactive Techs. Ltd., 42 NY3d 570, 572 [2024].)
"Ambiguity exists if the agreement, "read as a whole, fails to disclose its purpose and the parties' intent . . . , or when specific language is 'susceptible of two reasonable interpretations' " (Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014]). On the other hand, the agreement is unambiguous and should be enforced on its plain terms "if the language it uses has 'a definite and precise meaning, unattended by danger of misconception . . . , and concerning which there is no reasonable basis for a difference of opinion' " (Greenfield v Philles Records, 98 NY2d 562, 569 [2002]; see Quadrant Structured Prods. Co., Ltd. v Vertin, 23 NY3d 549, 559-560 [2014])." (Mulacek v. ExxonMobil Corp., 42 NY3d 931, 933 [2024].)
Parties' Contractual Intent
The contract states clearly that the intent of the agreement is for the defendant to "indemnify the Insured for Loss . . ., but only to the extent of the Default of Performance". (Emphasis added.) Both "Loss" and "Default of Performance" have defined terms in the [*7]contract.
"Loss" is defined as "Direct Costs and Indirect Costs paid by the Insured to the extent caused by a Default of Performance". (Emphasis supplied.) The contract, by defining "loss" to specifically exclude costs paid by the plaintiff not caused by a default of performance, contemplates that the insured losses are only those costs caused by a subcontractor's default of performance.
The contract also defines "default of performance", and who determines a "default of performance". "Default of Performance" is defined as the:
. . .failure of the Subcontractor /Supplier to fulfill the terms of the Covered Subcontract or Purchase Order Agreement as determined by the Insured or a court, arbitrator or arbitration panel, [sic] legally binding authority. A determination by a legally binding authority shall supersede any previous determination.
(Emphasis added.) This definition specifically limits "default of performance" to a determination made by a "legally binding authority" that may occur after the insured (the plaintiff) makes its initial determination of a default by a subcontractor. The clause "shall supersede any previous determination" contemplates that at a subsequent proceeding the previous determination of a default of performance by the insured could be countermanded by a legally binding authority, such as an arbitration panel, as occurred herein. There is no contractual language limiting the application of this provision to only an arbitration proceeding involving the insured (the plaintiff) and the insurer (the defendant).
The contract contains another limiting provision as to "loss". A contractual term states that "[t]he Insured must immediately return any payments made by the Company upon a determination by a court, arbitrator, or other legally binding determination that the Loss does not arise out of a Default of Performance". Again, there is no contractual language limiting the application of this provision to only an arbitration proceeding involving the insured (the plaintiff) and the insurer (the defendant).
The Contract Contemplates a Later Proceeding against a Defaulting Subcontractor
The contract contains subrogation provisions which contemplate a later action against the defaulting subcontractor to recover sums paid by the defendant to the plaintiff. Upon payment to the plaintiff on a Proof of Loss, the defendant assumed "all of the [plaintiff's] rights of recovery and other remedies against all persons, entities or organizations with respect to such payment". Furthermore, the contract stated that "[u]nless otherwise agreed to by the [defendant] and the [plaintiff], the [defendant] shall, at the [defendant's] option, pursue all recovery and subrogation actions for Losses paid."
The contract also contained a "waterfall" provision which set forth how any recovery from the defaulting subcontractor would be applied to the plaintiff and the defendant. Finally, the contract required the plaintiff to:
cooperate with the Company in the investigation, settlement or defense of any claim or suit and assist the Company, upon reasonable request, in the enforcement of any right against the person, entity or organization which may be liable to the Insured because of Loss to which this insurance applies, including but not limited to, filing any claims and enforcing any liens or security interest against a Subcontractor/Supplier or its property.
The parties herein executed a common interest agreement wherein they agreed, pursuant to the above provision, to allow the plaintiff to pursue recovery against National on behalf of the plaintiff and the defendant.
[*8]The Defendant Met its Burden in Establishing Its Interpretation is Correct
In interpreting the contractual terms, the Court determines that the contract is not ambiguous and it was the intent of the agreement for the defendant to pay only losses that resulted from a subcontractor's default of performance, as determined initially by the insured, but subject to a later determination by a "legally binding authority", such as the arbitration panel that determined the claims made by the plaintiff against National.
The interpretation of the contract advanced by the plaintiff would require the Court to ignore the plain language of the contractual provisions. The plaintiff argues that the provisions that refer to a determination by a legally binding authority would apply only to an arbitration or court action between the plaintiff and the defendant as to the terms of the SDI Policy.[FN9]
But the contractual language contains no such limitation and the plaintiff's interpretation would render other contractual language meaningless. Furthermore, the language states "as determined by the Insured or a court, arbitrator or arbitration panel" (emphasis supplied). The term "arbitrator" cannot refer to an arbitration between the parties herein, as the policy required any such arbitration to be conducted by an arbitration panel of three (3) arbitrators.[FN10]
The policy language support's the defendant's interpretation that the language contemplates a possible arbitration between the insured (plaintiff) and the defaulting subcontractor.
Under the plaintiff's interpretation, the defendant would be required to pay the proofs of loss, subrogate the plaintiff's rights against National, pursue a claim against National (though court action), and then initiate an arbitration against the plaintiff to determine the extent of the loss from the default of performance by National.[FN11]
No language in the contract supports that [*9]interpretation, and the interpretation advanced by the plaintiff ignores the "waterfall" provisions contained in the contract and the references to "arbitrator" and "arbitration panel" in the contractual terms which define "default of performance" and limit claims for loss.[FN12]
Under the contractual terms, a later recovery proceeding was contemplated by the parties — either through arbitration or court action- and the determination of that "legally binding authority" would determine the extent of the default of performance by the defaulting subcontractor.
The Court rejects the plaintiff's argument that once the defendant paid an amount claimed on a Proof of Loss, the defendant "waived" its right to repayment. This interpretation would also ignore the plain language of the contract i.e. the provision which states that a later determination of a legally binding authority supersedes the plaintiff's determination of a default of performance and the provision requiring the plaintiff to "return any payments made by the [defendant] upon a determination by a court, arbitrator, or other legally binding determination that the Loss does not arise out of a Default of Performance"). ""It is a well settled principle of contract law that a court should not adopt a construction of a contract which will operate to leave a provision of a contract without force and effect. An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation" (id. [internal quotation marks, ellipses and citations omitted])." (Piccirilli v. Yonaty, 204 AD3d 1322, 1324—25 [3rd Dept. 2022] quoting Nautilus Insurance Co. v. Matthew David Events, Ltd., 69 AD3d 457, 460 [1st Dept. 2010].)
The Court also rejects the plaintiff's argument that the defendant cannot seek repayment for previously paid claims as that would violate New York's anti-subrogation rule. The essence of the anti-subrogation rule is to prevent an insurer from seeking to recover from its insured payment on a loss for which the insured was covered under the policy. ". . . [I]t has often been said that an insurer may not be subrogated to a claim against its own insured, at least when the claim arises from an incident for which the insurer's policy covers that insured (see, e.g., Chrysler Leasing Corp. v. Public Administrator, 85 AD2d 410, 448 N.Y.S.2d 181; Beck v. Renahan, 26 AD2d 990, 275 N.Y.S.2d 1010, affg. 46 Misc 2d 252, 259 N.Y.S.2d 768; 16 Couch, op. cit. §§ 61:133, 61:134; see also, Hartford Acc. & Indem. Co. v. Michigan Mut. Ins. Co., 61 NY2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608)." (Pennsylvania Gen. Ins. Co. v. Austin Powder Co., 68 NY2d 465, 471 [1986], emphasis supplied.)[FN13]

Here, the defendant sought recovery for payment of an amount that was paid on a loss that was not covered by the policy. As the defendant is not seeking recovery for a loss that was covered by the policy, the antisubrogation rule is not implicated. (See e.g., McGurran v. DiCanio Planned Dev. Corp., 216 AD2d 538 [2nd Dept. 1995].) Furthermore, as the policy did not require the defendant to defend the plaintiff in any litigation action between the plaintiff and a third party, the other public policy ground of the antisubrogation rule is not implicated. ("The two primary purposes of the antisubrogation rule are to avoid "a conflict of interest that would undercut the insurer's incentive to provide an insured with a vigorous defense" and "to prohibit an insurer from passing its loss to its own insured" (id.)." (Millennium Holdings LLC v. Glidden Co., 27 NY3d 406, 415 [2016].)
The Court denies the plaintiff's motion for summary judgment on its 4th cause of action seeking a declaratory judgment that the defendant's demand for repayment violates New York's antisubrogation rule.
The Panel's Interim Decision is Binding
The Court rejects the plaintiff's argument that the Panel never made a determination that a portion of the plaintiff's losses "did not arise out of a Default of Performance". The Panel made specific findings that the plaintiff did not support its damages demands, the plaintiff was partially responsible for losses it incurred, and the losses sought were inflated due to requests for reimbursement from National for losses not properly attributable to National, such as "repairing defective work by US Framing, or repairs made necessary by other trades, or acceleration of the schedule, or delays within the completion schedule". The Panel excluded claimed losses that it determined were not attributable to National's default, and the Panel's decision clearly falls under the policy's language that "[a] determination by a legally binding authority shall supersede any previous determination" as to Default of Performance made by the plaintiff. These losses are not attributable to National's default of performance, as they are damages outside the scope of work in the contract between the plaintiff and National.[FN14]

The Panel attempted to "assess a fair value" of the damages attributable to National's default and determined those damages to be substantially less than paid by the defendant under the policy. As noted above, pursuant to the policy terms, that decision is binding on the plaintiff.
Thus, the Court finds that the defendant's interpretation of the contract is correct and [*10]awards summary judgment to the defendant on its cause of action seeking repayment of $5,576,144.07.[FN15]

The Defendant's Motion for Summary Judgment on the Ground that the Plaintiff Failed to Mitigate its Damages is Denied
The Court rejects the defendant's argument that as the policy had a condition subsequent requiring the plaintiff to mitigate damages, and the arbitration decision specifically held that the plaintiff did not do so, that this obviates coverage under the policy.
The policy required the plaintiff to "to use all reasonable measures to prevent and to mitigate Loss at all times". However, the contractual language requiring the plaintiff to mitigate loss does not contain any language which requires a determination by a "legally binding authority", i.e. the Panel, to be dispositive on that issue. The language in the policy referring to a "legally binding authority" refers only to the determination of a default in performance. The contractual language of a "legally binding determination that the Loss does not arise out of a Default of Performance" does not apply to the contract's exclusion for failure to mitigate damages.
""[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so 'in clear and unmistakable' language" (Seaboard Sur. Co. v Gillette Co., 64 NY2d 304, 311 [1984]). "Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction" (id.)." (Walker v. Erie Ins. Co., 210 AD3d 1375, 1377 [4th Dept. 2022].) Here, the defendant did not explicitly state in the contract that a determination by any "legally binding authority" that the plaintiff failed to mitigate damages was conclusive. This Court cannot construe the contract to graft that provision onto the policy exclusion. "Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements (see ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581, 597 [2015]; Matter of Westmoreland Coal Co., 100 NY2d at 358; Reiss, 97 NY2d at 199)." (Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc., 30 NY3d 572, 581 [2017].)
Thus, the Court concludes that this provision is enforceable by the defendant only in a dispute resolution proceeding pursuant to the Section 8. CONDITIONS, paragraph c., Dispute Resolution of the policy.
Furthermore, whether the plaintiff took "all reasonable measures" to mitigate loss "at all times" is a question of fact that cannot be determined on the parties' submissions.
The Defendant's Motion for Summary Judgment on the Ground that the Plaintiff Breached the Contract is Denied; the Plaintiff's Motion for Summary Judgment that the Defendant Breached the Contract is Denied; the Plaintiff's Motion for Summary Judgment on its 3rd Cause of Action is Denied
The defendant argues that as the plaintiff failed to return the $5,576,144.07 as demanded by the defendant, the plaintiff materially breached the contract, relieving the defendant from paying Proofs of Loss 13 through 16. The plaintiff argues that the defendant, in failing to pay the [*11]Proofs of Loss within thirty (30) days or notify the plaintiff of a deficiency in the Proofs of Loss within that time period, breached the contract. Both parties seek summary judgment on these issues.
The essence of both parties' claims is a dispute over "the amount of loss the [plaintiff] has incurred or paid".
According to the policy terms:
The Proof of Loss and any amounts claimed as covered Loss(es) under this Policy are subject to audit by the Company in accordance with Section 8 Conditions, paragraph i. Inspection and Audit. 
 In the event that the 
 Insured and the Company cannot agree that a claim is a 
 Loss, or cannot agree on the amount of 
 Loss the 
 Insured has incurred or paid, either party may commence proceedings in accordance with Section 
 8. CONDITIONS, paragraph c., 
 Dispute Resolution, of this Policy.[FN16] (Bold in original, emphasis added.)
The parties agreed to mediate their dispute pursuant to the terms of the policy. By invoking the dispute resolution procedures in the contract, neither side breached the contract. There is no language in the policy that requires the defendant to pay the Proofs of Loss prior to initiating the dispute resolution procedures.[FN17]
There is no language in the policy requiring the plaintiff to return funds due to an overpayment prior to initiating the dispute resolution procedure. The contract contemplates that those issues would be resolved through binding arbitration.[FN18]
Neither party breached the contract by proceeding with enforcing their rights under the contract to resolve their dispute about the extent of the plaintiff's loss.
The respective motions seeking a determination that the opposing party breached the contract are denied.[FN19]

The plaintiff's motion for summary judgment on its 3rd cause of action (that the defendant violated the implied covenant of good faith and fair dealing) is denied. The cause of action alleges that the defendant demanded repayment only after the plaintiff submitted additional proofs of loss (numbered 12 through 16).
As the Court of Appeals observed in Cordero v. Transamerica Annuity Serv. Corp.:
In New York, "all contracts imply a covenant of good faith and fair dealing in the course [*12]of performance" (Jennifer Realty, 98 NY2d at 153). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (Dalton v Educational Testing Serv., 87 NY2d 384, 389 [1995] [internal quotation marks omitted]). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion" (id.). This Court has consistently observed that the covenant requires the parties to perform under the contract "in a reasonable way" (New York Cent. Iron Works Co. v United States Radiator Co., 174 NY 331, 335 [1903]). In discerning what is "reasonable," the Court looks to what the parties would have expected under the contract: the Court will infer that contracts "include any promises which a reasonable person in the position of the promisee would be justified in understanding were included" at the time the contract was made (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69 [1978] [internal quotation marks omitted], quoting 5 Williston on Contracts § 1293 at 3682 [rev ed 1937]; see Wilson v Mechanical Orguinette Co., 170 NY 542, 550-551 [1902]). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship" (Murphy v American Home Prods. Corp., 58 NY2d 293, 304 [1983]).
(39 NY3d 399, 409—10 [2023].)
Here, whether the defendant breached any implied covenants (as alleged by the plaintiff, manufacturing reasons to deny coverage, and/or deviating from its own practice or industry practices) is necessarily a question of fact that cannot be resolved on the parties' submissions.[FN20]

The Defendant's Motion for Summary Judgment on its 3rd Counterclaim is Denied
The defendant's 3rd counterclaim seeks recovery of the Damages Award ($2,502,785.88 less the amount previously paid for a sum of $987,925.87) pursuant to the policy's waterfall provision that required the defendant to be paid any award amounts up to the losses paid to the plaintiff less recovery costs.
The defendant's counterclaim is based upon two alternative theories of recovery. The first is that the policy requires the plaintiff to take "all reasonable steps to preserve the right of collection of the Award Amount" from National; and if National remains liable for the payment, then the plaintiff failed to preserve the right to recover the Award Amount from National. The second theory is that "[i]f [National's] misdirected payment satisfied its obligation to pay the Award Amount, then [plaintiff] breached the SDI Policy by failing to pay the Award Amount to" the defendant.
The policy required the Damages Award, once recovered, to be paid to the defendant. The policy states:
After payment of the Loss, any funds or salvage recovered will be paid to the Company and shared between the Insured and the Company in the following order:
i. The Company will be fully reimbursed for the Company's costs of recovery, including but not limited to, attorney fees, expert witness fees, arbitrator fees and court and arbitration costs and expenses;
ii. next, if any funds remain, the Company will be fully reimbursed for the Loss amount the Company paid in excess of the sum of the SIR listed in Item 5. of the Declarations; and
iii. next, if any funds remain and the Insured paid a Co-payment Amount, then the Insured and the Company will share, based on the Co-payment Amount listed in Item 6. of the Declarations, any remaining sums until the amount of the Company's payment of the Loss and the Company's cost of recovery have been fully reimbursed.
Sums remaining after all payments in subparagraphs 7.e.(i) through 7.e.(iii) hereto, if any, shall be retained solely by the Insured. The application of amounts recovered as described above applies regardless of any designation of amounts by the Subcontractor/Supplier or any other party.
Whether the plaintiff took "all reasonable steps" to ensure that the payment of the Damages Award from National was received by the plaintiff for transmittal to the defendant is a question of fact. Whether the payment was diverted due solely to the actions of the plaintiff and its counsel Crowell, or whether Crowell was acting on behalf of both the plaintiff and the defendant herein, and thus responsibility for the diverted payment is jointly held by the plaintiff and the defendant, cannot be determined on the parties' submissions.[FN21]

Similarly, relief cannot be granted on the defendant's alternative theory that "[i]f [National's] misdirected payment satisfied its obligation to pay the Award Amount, then [plaintiff] breached the SDI Policy by failing to pay the Award Amount to" the defendant. The issue of whether National's misdirected payment satisfied National's obligation cannot be determined on the parties' submissions.
The defendant's motion for summary judgment on its 3rd counterclaim is denied.
Based upon the foregoing, and the papers filed herein,[FN22]
the Court partially grants the [*13]defendant's motion for summary judgment, determining that the plaintiff is required to repay the defendant $5,576,144.07. The remaining motions are denied.
Counsel for the defendant shall submit a proposed order, on notice, reflecting the above by June 10, 2025.
Dated: April 30, 2025
Hon. Daniel J. Doyle
Supreme Court Justice

Footnotes

Footnote 1:The term "plaintiff" shall include The Pike Company, Inc. as additional defendant on the counterclaims.

Footnote 2:The "additional defendant on the counterclaims" Pike Construction Services, Inc., incorrectly named and formerly known as The Pike Company, Inc. ("Pike") was properly added as a counterclaim defendant pursuant to CPLR § 3019.

Footnote 3:The Common Interest Agreement stated that "[p]ursuant to paragraph 7.b. of the Policy, the parties expressly agree that Lecesse shall prosecute the National Claims. Lecesse may prosecute the National Claims in its own name, in the name of Hudson, or both, as may be necessary to ensure that standing exists to seek recovery of all sums that are the subject of the National Claims." The agreement also stated that "Lecesse shall timely preserve, assert, prosecute, and otherwise pursue all other existing and potential National Claims except as otherwise may be agreed among the Parties in writing" and that the "recoveries from the prosecution or assertion of the National Claims shall be distributed in accordance with paragraph 7.e. of the Policy, provided that such recoveries pertain to damages, fees, costs, expenses, or other losses incurred by reason of National's Default of Performance". The agreement also stated that it did not alter the terms of the underlying SDI Policy, and each party was reserving its rights under the terms of the SDI Policy.

Footnote 4:The proofs of loss (13 through 16) are not submitted as exhibits.

Footnote 5:Emphases in original.

Footnote 6:The arbiters also determined that ". . . [National] proved the damages [plaintiff] sought should be reduced as the record keeping for the damages did not segregate corrective work arising from [National's] defaults from items of work unrelated to [National's] defaults."

Footnote 7:Emphasis in original.

Footnote 8:The arbiters also determined that the plaintiff failed to establish entitlement to delay damages, as National was not the "sole cause of delay on the Project during the time [National] worked on the project." The arbiters also concluded that the plaintiff was not entitled to mold damage, as "the buildings were left open and exposed to the elements for an extended period of time for reasons that were not within [National's] control."

Footnote 9:The Court rejects the plaintiff's argument that the defendant, by enforcing the contractual terms, somehow required the plaintiff to "waive" its right to contest whether "the payments from Hudson to Lecesse arose from National's Default of Performance (as that term is defined in the SDI Policy) or whether Hudson is entitled to reimbursement from Lecesse for amounts that did not arise out of a Default of Performance". The plaintiff was obligated by the common interest agreement to pursue all claims it had against National, and the plaintiff had every incentive to maximize its recovery in the arbitration proceeding against National as any amounts it recovered from National above what was paid by the defendant (less costs of the arbitration) the plaintiff would retain. As the contract contemplated that should the arbitration panel award damages related to National's default of performance in an amount less than the plaintiff initially received from the defendant, the defendant would be entitled to repayment from the plaintiff, there was no need for the defendant to separately notify the plaintiff that it would "seek reimbursement should the [arbitration] Panel fail to award the full amount of damages claimed". That reimbursement was required under the contractual terms: "[t]he Insured must immediately return any payments made by the Company upon a determination by a court, arbitrator, or other legally binding determination that the Loss does not arise out of a Default of Performance."

Footnote 10:"The parties further agree that from the list of arbitrators provided by the AAA a panel of three (3) neutral arbitrators shall be agreed upon."

Footnote 11:Obviously, the defendant could not arbitrate its subrogated claims under the SDI Policy against National, an entity with which it did not have contractual privity to enforce an arbitration provision that existed between the plaintiff and National pursuant to Article 11 of the Master Subcontract Agreement.

Footnote 12:Additionally, the plaintiff's interpretation would result in the potential of inconsistent awards in two fora. The defendant's correct interpretation would obviate this potentiality- the binding determination of an arbitration (in this case between the plaintiff and National pursuant to the dispute resolution process set forth in the Master Subcontract Agreement) would bind the plaintiff and the defendant herein as to the extent of the loss attributed to a default in performance by National.

Footnote 13:See also Jefferson Ins. Co. of New York v. Travelers Indem. Co.: "This antisubrogation rule—that an insurer cannot be a subrogee against its insured on the very claim for which the insured was covered—is premised, in part, on the avoidance of a conflict of interest that would undercut the insurer's incentive to provide an insured with a vigorous defense. Additionally, enforcement of the rule seeks to prohibit an insurer from passing its loss to its own insured." (92 NY2d 363, 373, 703 [1998], emphasis supplied.) See also Millennium Holdings LLC v. Glidden Co., "However, the antisubrogation rule is an exception to the right of subrogation (see Pennsylvania Gen. Ins. Co. v Austin Powder Co., 68 NY2d 465, 468 [1986]). Under that rule, "an 'insurer has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered . . . even where the insured has expressly agreed to indemnify the party from whom the insurer's rights are derived'" (ELRAC, Inc., 96 NY2d at 76, quoting Pennsylvania Gen. Ins. Co., 68 NY2d at 468). (27 NY3d 406, 415 [2016], emphasis supplied.))

Footnote 14:"Default of Performance means failure of the Subcontractor /Supplier to fulfill the terms of the Covered Subcontract . . .". (Emphasis supplied.)

Footnote 15:As amended by the defendant's memorandum of law (NYSCEF Docket # 61) at page 11 FN 5.

Footnote 16:Paragraph c. of Section 8 of the policy requires the parties to mediate their disputes. Upon failure of mediation, the parties may arbitrate their claims. Instead of arbitration, the parties stipulated to litigate their claims in the instant action.

Footnote 17:Although the policy language requires the defendant to pay the amount demanded in the proof of loss within thirty (30) days or notify the plaintiff of deficiencies in the proof of loss within that time period, the defendant- within the thirty day period- objected to paying further proofs of loss. (See NYSCEF Docket # 8.) Both sides thereafter agreed to mediation and eventual litigation.

Footnote 18:The policy language contemplates that the arbitration will lead to a determination "determining that such amount is due".

Footnote 19:The plaintiff's motion for summary judgment on its 1st and 2nd causes of action; the defendant's motion for summary judgment on its 2nd counterclaim.

Footnote 20:
 The plaintiff did not meet its initial burden in establishing a violation of the implied covenant of good faith and fair dealing by the defendant. The plaintiff does not submit any evidentiary submissions in support of their motion on this ground. Instead, the plaintiff argues in its memorandum of law that the defendant's objection to proofs of loss 13 through 16 was out of "disappoint[ment] with the amount of the Damages Award and [the defendant] is seeking to shift that loss unfairly to [plaintiff] and simultaneously seeking to escape its ongoing obligation to make payments to [plaintiff] under the SDI Policy as it had done previously. . . ". Absent evidence to support these arguments, they are not sufficient to meet the plaintiff's initial burden.

Footnote 21:The common interest agreement, as modified, gave the defendant certain rights of oversight of Crowell in the prosecution of the claims against National. For instance, the agreement stated that Wharton (and his co-counsel) "shall provide at least monthly repot1s to Hudson's counsel, Chiesa Shahinian & Giantomasi PC ("CSG"), concerning the status of any litigation, arbitration, or other dispute resolution proceedings with National, and shall confer with CSG, upon request, on advice and input concerning the prosecution of the National Claims."

Footnote 22:Notice of Motion (NYSCEF Docket # 35); Affirmation in Support with exhibits (NYSCEF Docket #s 36-41); Memorandum of Law (NYSCEF Docket # 42); Affirmation in Opposition to Cross-Motion and in Further Support of Motion with exhibits (NYSCEF Docket #s 63-64); Memorandum of Law in Opposition to Cross-Motion and in Further Support of Motion (NYSCEF Docket # 65); Notice of Cross-Motion (NYSCEF Docket # 46); Affirmation in Support with exhibits (NYSCEF Docket #s 47-50); Affirmation in Support with exhibits (NYSCEF Docket #s 51-56); Affirmation in Support with exhibits (NYSCEF Docket #s 57-60); Memorandum in Opposition to Motion and in Support of Cross-Motion with exhibit (NYSCEF Docket #s 61-62); Affirmation in Opposition to Cross-Motion and in Further Support of Motion with exhibit (NYSCEF Docket #s 66-67); Memorandum of Law in Opposition to Cross-Motion and in Further Support of Motion (NYSCEF Docket # 68); Memorandum of Law in Reply (NYSCEF Motion # 69).